*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MACKINAW AREA TOURIST BUREAU, INC., doing business as MACKINAW AREA VISITORS BUREAU, AMERICAN BOUTIQUE INN, AMERICA'S BEST VALUE, BAYMONT INN & SUITES, BAYSIDE HOTEL MACKINAC, BEACHCOMBER MOTEL, BEST WESTERN DOCKSIDE, BRIDGE VISTA BEACH HOTEL, BRIGADOON BED & BREAKFAST, BUDGET INN MACKINAW, CABINS OF MACKINAC, CAPRI MOTEL, CLARION HOTEL BEACHFRONT, COMFORT INN–LAKESIDE, COURT PLAZA INN & SUITES, CROWN CHOICE INN & SUITES, DAYS INN–LAKEVIEW, ECONO LODGE BAYVIEW, FAIRVIEW BEACHFRONT INN, GREAT LAKES INN, HAMILTON INN SELECT, KNIGHTS INN, LAMPLIGHTER MOTEL, LIGHTHOUSE VIEW MOTEL, MACKINAW BEACH & BAY MOTEL, PARKSIDE INN–BRIDGEVIEW, QUALITY INN & SUITES, RAINBOW MOTEL, RAMADA INN WATERFRONT, STARLITE BUDGET INN, SUPER 8–BEACHFRONT MOTEL, SUPER 8–BRIDGEVIEW MOTEL, THUNDERBIRD INN MACKINAW, TRAILSEND MOTEL, VINDEL MOTEL, WATERFRONT INN, WELCOME INN, MACKINAC BAY TRADING COMPANY, MACKINAW CROSSINGS, MACKINAW COFFEE, INC., FRANK & STUFF, INC., DIXIE SALOON, INC., RUM RUNNERS ISLAND, INC., ANNA LIEGHIO, INC., MACKINAC BAY WATER, INC., MACKINAC BAY WATER PARK, INC., TBWC RESTAURANT, INC., and MACKINAW DEPOT, INC.,

       Plaintiffs-Appellees/Cross-Appellants,

v

FOR PUBLICATION
May 23, 2024
9:00 a.m.

No. 361625

-1-

VILLAGE OF MACKINAW CITY,

Defendant-Appellant/Cross-Appellee.

---

Before:  O'BRIEN, P.J., and K. F. KELLY and M. J. KELLY, JJ.

O'BRIEN, P.J.

Defendant, Village of Mackinaw City (the Village), was informed by the Michigan Department of Environmental Quality (DEQ)[1] that it was out of compliance with the Michigan Safe Drinking Water Act, MCL 325.1001 *et seq.* (Act 399), due to insufficient water storage capacity, and that the Village's current funding structure for its water and sewer systems was not sufficient to adequately support the systems' needs.  To remedy these deficiencies, the Village increased its water and sewer rates.  This led plaintiffs, Mackinaw Area Tourist Bureau, doing business as Mackinaw Area Visitors Bureau,[2] to file suit, claiming that the water- and sewer-rate increases were a disguised tax levied without voter approval contrary to Const 1963, art 9, § 31 of the Headlee Amendment.[3]  The Village filed a motion for summary disposition, and plaintiffs responded by arguing that the trial court should deny the Village's motion and grant summary disposition in plaintiffs' favor.  The trial court sided with plaintiffs.  It reasoned that the Village's rate increases constituted a tax because a portion of the water-rate increase would be used to fund the construction of a new water tower.  The court believed that "new infrastructure" could never be funded through a user fee, so the water-rate increase must be a tax.  This was error.  Increasing water and sewer rates to generate revenue to fund necessary capital improvements to the systems serves a regulatory purpose.  There is no bright-line rule prohibiting water rates from being increased to fund "new infrastructure" necessary for the water-supply system's continued safe operation.  Applying the three-factor test from *Bolt v City of Lansing*, 459 Mich 152; 587 NW2d 264 (1998), we conclude that the disputed rates did not constitute a tax.  We accordingly reverse the trial court's order granting plaintiff's motion for summary disposition and remand for the trial court to enter an order granting summary disposition in favor of the Village.

## I.  BACKGROUND

The Village was established under the Michigan General Law Village Act, MCL 61.1 *et seq.* and operates a municipal water and sanitary sewer system.  The Village was not required to

---

[1] Shortly before this lawsuit commenced, the DEQ was renamed the Department of Environment, Great Lakes, and Energy, see EO 2019-06, but this opinion will refer to the department as the DEQ for consistency.

[2] The Mackinaw Area Tourist Bureau is a domestic nonprofit corporation comprising the named privately owned businesses.

[3] The Headlee Amendment is the popular name for Const 1963, art 9, §§ 25-34.

operate a water system,[4] but by electing to do so, it became a "supplier of water,"[5] subject to Act 399.[6]

In 2014, the Village entered into a Stormwater, Asset Management, and Wastewater (SAW) grant agreement with the DEQ and the Michigan Finance Authority under which the state provided 90 percent of the total cost for the Village to obtain a storm and wastewater asset management plan. The agreement provided, in part:

> SAW grant recipients for wastewater system management are required to make significant progress on the funding structure. Significant progress is defined as a 5-year plan to eliminate the gap with a minimum initial rate increase to close at least 10 percent of the funding gap. The first rate increase must be implemented within three years of the executed grant. The applicant will need to certify that all grant activities have been completed at the end of three years. Asset management plans for stormwater systems are to be implemented.[7]

On May 15, 2015, the DEQ, after conducting a sanitary survey and evaluating the Village's water system with respect to the regulatory requirements in Act 399, notified the Village's interim manager of a deficiency with respect to finished water storage.[8] The DEQ said that the following deficiency constituted a violation of Act 399 and "must be resolved in order to return the water system to compliance":

> 1. The Village has deficient storage capacity. Part 11, *Distribution Systems and Storage Tanks*, of Act 399 requires the Village to have sufficient distribution system capacity to meet peak flows and emergency conditions while maintaining minimum pressures throughout the entire distribution system. Page 7 of the enclosed Sanitary Survey form provides more detailed information. Also, the Village's March 2012 Reliability Study discusses this deficiency in greater depth. Please provide a compliance schedule to address this on-going deficiency.

The DEQ also made recommendations in the "financial" area. The DEQ stated that "the following recommendations will prove useful in enhancing the operation and maintenance of the Village's water supply":

---

[4] See MCL 71.1.

[5] MCL 325.1002

[6] MCL 325.1003.

[7] A rate study was conducted as part of the asset management plan, which is referenced later in this opinion.

[8] MCL 325.1003 of Act 399 provides in relevant part that "[t]he director may enter upon the waterworks system of a supplier of water at reasonable times for the purpose of inspecting the system and carrying out this act and rules promulgated under this act."

1. The Village needs to evaluate its staffing plan to ensure continued compliance with Act 399. The Village has a good preventative maintenance program started for valves and hydrants, is collecting data for its Asset Management Program, and working on a comprehensive cross-connection control program. All of these programs take staff hours to keep them updated and functioning. The DEQ highly encourages the Village to continue all of these programs to continue to provide high quality drinking water to its residents and visitors.

2. The Village needs to evaluate its current security plan for effectiveness in keeping water system facilities safe and deterring malicious activity. DEQ staff recommends the Village consider adding fencing and signage around source and tower facilities. The Village needs to ensure adequate security is provided for all of its facilities.

3. Provide a detailed 20-year Capital Improvements Plan along with budget information by no later than December 31, 2015, to meet the requirements of Act 399; specifically, Rule 1606, *publicly owned or operated community water supplies; additional general plan requirements*.

Later, in a May 4, 2017 letter to the Village's interim manager, the DEQ addressed the Village's "aging water supply system" and the "complexity" of the Village's service area. The letter stated in relevant part:

[T]he census population remains relatively constant. The [V]illage has four wells, a firm treatment capacity of 1.7 million gallons per day, and one elevated tank with a proposal for a second tank. In addition, it currently serves a commercial district with 3,300 hotel rooms in 38 different hotels. Based on this information, the [DEQ] Drinking Water and Municipal Assistance Division (DWMAD), is reclassifying the distribution level from an S-4 to S-3. The S-3 classification covers distribution systems serving a population of less than 4,000. This reclassification shall be effective on November 5, 2017. The Village's operator-in-charge is certified to one level above this classification. So, no action is needed by the [V]illage.

. . . The Village is also working with its engineering firm and Michigan Rural Water Association [MRWA] staff to revise its water and sewer rate structure and Asset Management Program. Based on the complexity of the Village's water supply system, and the fact it routinely serves a population greater than 1,000, the Village is required to have an Asset Management Program in place beginning January 1, 2018.

The letter included an attachment—DEQ's "Asset Management Guidance." The attachment referenced Mich Admin Code, R 325.11606, which requires a community water supply that serves more than 1,000 people to implement an asset management program as defined in Rule 325.10102 beginning January 1, 2018. The rule stated that asset management plans shall include, among other requirements:

(d) A capital improvements plan that identifies waterworks system needs for 5-year and 20-year planning periods. . . .

(e) A summary detailing the funding structure and rate methodology that provides sufficient resources to implement the asset management program.

On September 12, 2017, the DEQ sent yet another letter to the Village's manager summarizing the DEQ's review of the Village's water-supply facilities for compliance with Act 399. The DEQ acknowledged that the Village had addressed some of the deficiencies and recommendations since the DEQ's last sanitary study, but identified two deficiencies that amounted to continuing violations of Act 399—"Finished Water Storage" and "Financial." The DEQ explained these deficiencies as follows:

1. The Village needs to expand upon its current water storage capacity. The current capacity is in violation of Act 399; specifically, Rule 1105, as it is not of sufficient capacity to provide for the fire flow needs of the service area while continuously maintaining acceptable pressure levels throughout the system. The Village council will need to increase revenue to address the water storage capacity deficiency.

2. The rates need to be reviewed and increased in order to adequately support the water supply. Act 399 requires that a community water supply have adequate technical, financial, and managerial capacity to maintain compliance with the act. The issue of inadequate funding can further infringe on Part 12, Reliability, of Act 399, which establishes the requirements for maintaining the reliability of public water supply systems to assure a continuous supply of water, including the system capacity, number of wells, and equipment meant to protect against interruptions in service. Current rates are too low to meet the required financial needs to sustainably operate the system. Rate increases are recommended to allow for the current Capital Improvement Plan to be actionable.

The DEQ offered the following recommendation to "enhance the operation and maintenance of the Village's water supply":

Part of the Village's responsibility is ensuring a secure financial future for the operation of the water supply. The current rate structure does not allow for this. The Village council needs to take action to increase revenue to ensure proper financial and managerial capacity is available to operate, maintain, and replace the Village's existing infrastructure, as well as add new infrastructure when needed. Both the revision of the rate structure and pursuit of additional funding opportunities are recommended.

The DEQ concluded the September letter by asking the Village to submit a plan to address the identified deficiencies in its water-supply system.

An engineering firm, C2AE, prepared a capital improvement plan for the Village in October 2017. The plan concluded that, although existing rates were sufficient to pay for some

short-term improvements and repairs of the wastewater and stormwater systems, a rate adjustment was needed to fund the replacement of equipment and some capital improvements for the Village wastewater system.

Rate expert John Holland of the MRWA assisted the Village in the creation of a rate structure for its water and sewer rates. At some point early in the process, the MRWA gave a rate-structure presentation to the Village council in which the MRWA sought to "receive direction from [the council] as to how to further proceed in the development of the rate structure for the Village."[9] The MRWA noted that, while the current population of the village was 860, the system was sized for a population of 12,000 to 13,000 because of the tourist industry. It explained that three or four hotel rooms are the equivalent of one house and that there were an estimated 2,800 to 3,000 hotel rooms in the village. "The large hotels require the community to have a large capacity for flows and fire protection," the MRWA claimed. Turning to how the Village could determine rates, the MRWA explained that rates in general should consider asset management, budget (including day-to-day operation and maintenance costs), payroll, debt payments and reserves (for both present and future), and capital improvements. For the customer base that would be charged the rates, the MRWA focused on (1) the number of meters and the size of those meters for both water and sewer and (2) the amount of water sold and to whom that water was sold. According to the MRWA, the Village sold 23,312,199 gallons of water per year to customers using less than 50,000 gallons per quarter, and 45,706,282 gallons of water per year to customers using more than 50,000 gallons per quarter. Using one quarter as an example, the MRWA claimed that there were 654 customers; 534 customers used less than 50,000, and 120 customers used more than 50,000 gallons. "This means that 18% of your customers use 66% of your water," the MRWA explained. Turning to ways in which the Village could structure its rates, the MRWA stated that the Village could use an ascending rate—which "is a rate where the commodity charge increases as the customer usage increases"—or a non-ascending rate. The MRWA noted that an ascending-rate structure "pushes the cost of the large system to the larger users." For the preliminary meeting, the MRWA used a 50,000-gallon cutoff and a 50% markup as an example. At the end of the presentation, the MRWA stated that it needed to know whether the Village council wanted the MRWA to use an ascending or non-ascending rate structure in its rate study and, if an ascending rate structure was desired, whether the MRWA should "use 50% mark up on commodity charge over 50,000 gallons."

After this meeting but before recommending a new rate structure, Holland considered all of the future capital improvements recommended in the capital improvement plan. Then, according to minutes from a Village council meeting on January 4, 2018, Holland gave a presentation to the Village council "summarizing the conclusion of the rate study and asset management they performed for the Village along with engineering firm C2AE." The minutes from the meeting stated:

> Mr. Holland noted every community has unique circumstances to address when providing safe water and sewer services. The Village has to have infrastructure in

---

[9] This quote and the remaining discussion of the MRWA's presentation come from a PowerPoint presentation included in the record. The details of the actual discussions that occurred during and following the presentation are not included in the lower court record.

place for not only the 850 year-round residents but to service the demand of thousands of seasonal visitors. On hand to explain the need for a second water tank to accommodate water suppression assurance for firefighting multiple story buildings was MI DEQ District Supervisor, Brian Thurston, P.E.

Following this presentation, the Village council voted to approve the rate structure as presented and a two percent increase. The January 4, 2018 resolution resulted in a tiered (or ascending) rate structure—water and sewage charges per 1,000 gallons up to 50,000 gallons were charged one rate, and water and sewer charges per 1,000 gallons over 50,000 were charged at a higher rate.

## A. THE ENSUING LITIGATION

Plaintiffs' complaint, while not a model of clarity, challenged the water and sewer rates adopted on January 4, 2018, claiming that the increase in rates was "actually a disguised tax" implemented without voter approval in violation of the Headlee Amendment, Const 1963, art 9, § 31. Plaintiffs alleged that the rate increase was to fund a "capital improvement plan for necessary infrastructure improvements and/or replacements." Citing *Bolt*, plaintiffs claimed that this rendered the rate increase "a disguised tax because it is disproportionate to the necessary cost of providing service, involuntary, and imposed to raise revenue rather than for a regulatory purpose."

Following discovery, the Village moved for summary disposition under MCR 2.116(C)(10), arguing that plaintiffs could not meet their burden of proving that the Village's increased water and sewer rates contained a charge that qualified as a tax. According to the Village, the increased rates constituted user fees because they satisfied all three of the criteria from *Bolt*—the rates (1) served a regulatory purpose, (2) were proportionate to the necessary cost of the services, and (3) were voluntary.

As to the first *Bolt* factor, the Village argued that the operation of water and sewer systems is a regulatory activity, and that the Village's increased water and sewer rates are a valid user fee because they serve the regulatory purpose of providing water and sewer service to the Village's residents. That the water and sewer rates generated revenue "doesn't matter," according to the Village, because the revenue generated from the rates was used for the underlying regulatory purpose of operating and maintaining the water and sewer systems. The Village claimed that all revenue generated from the water and sewer rates was allocated solely to the operation of the water and sewer system, and that plaintiffs had not suggested otherwise.

Turning to the second *Bolt* factor, the Village contended that its increased rates were reasonable, which was "highly relevant" to whether the rates were proportionate. Caselaw, the Village said, requires courts to start with a presumption that municipal utility rates are reasonable. Plaintiff bore the burden of overcoming this presumption, and the Village argued that plaintiff had not presented any evidence to rebut the presumption. "Plaintiff's bare and speculative assertions that the rates are unreasonable are without weight," the Village contended.

Contrasting itself to plaintiff, the Village said that it had engaged an independent expert in ratemaking, Mark Beauchamp, who analyzed the Village's water and sewer rates. Beauchamp testified that the Village's choice to charge high-volume users of water a higher rate was justified based on the Village's "very unusual pattern" of water usage, where the summer peak usage was

2.8 times the average usage; in most communities, according to Beauchamp, summer usage is only 1.2 to 1.7 time higher than the average use. Beauchamp further opined that both (1) using a break point of 50,000 gallons for the step-up pricing and (2) the stepped-up rate of a 50-percent increase were reasonable. In fact, Beauchamp thought that the 50-percent step-up amount should be higher. The Village additionally directed the court's attention to community comparison charts, which showed, according to the Village, that "the Village's rate structure puts its customer in the middle of the pack" because customers of all meter sizes "would have paid more in total charges in at least one third of the other communities." All of this evidence, the Village argued, refuted plaintiffs' "unsubstantiated assertion that the Village's rates are unreasonable."

The Village acknowledged that, in response to interrogatories, plaintiffs had contended that the Villages water and sewer rates were unreasonable because the rates raised money for future capital improvements. The Village argued that this did not make the rates unreasonable because (1) the Court of Appeals had held that revenue generated by water and sewer rates could be used to fund future capital improvements, (2) Beauchamp testified that using revenue generated by water rates to fund necessary capital improvements was standard, not only based on his experience but according to the main ratemaking manual for water and sewer systems, (3) the DEQ required the Village to generate capital reserves through increased rates, and (4) plaintiffs' argument was based on the misconception that the capital improvements were only necessary if the Village sought to expand the system, when in reality, "[t]he capital improvements are required for the continued operation of the system for the current users."

Lastly, regarding the third *Bolt* factor, the Village relied on established caselaw to argue that water and sewer charges are voluntary because users can control how much water they use.

In response, plaintiffs clarified that, in their opinion, the Village violated the Headlee Amendment because a portion of the water- and sewer-rate increase was "for the express purpose of <u>funding construction of new infrastructure</u>," namely an additional water tower. Plaintiffs argued that, with this understanding of the Village's purpose for increasing water and sewer rates, application of the *Bolt* criteria showed that (1) the purpose of the new rates was to raise revenue for future improvements; (2) the rates were not proportional to the current costs of service; and (3) the rates were compulsory upon users.

For the first *Bolt* factor, plaintiffs argued that increasing the water and sewer rates to raise revenue for future improvements, as opposed to defraying the costs of a regulatory activity, amounted to a revenue-raising purpose. Plaintiffs emphasized that the "crux of the Village's Headlee violation" was the "distinction between construction of infrastructure improvements and operation/maintenance of improved infrastructure[.]" The deficiency in the Village's water-storage capacity, according to plaintiffs, could only be addressed by "adding to the existing infrastructure, i.e. making capital improvements," which was distinct from any "operational costs for existing infrastructure." Plaintiffs summarized that the increase in the water and sewer rates crossed the line from a regulatory fee to a revenue-raising tax because the increase was intended to generate revenue to pay for the construction of new infrastructure, but "fees can only be used to cover current costs of operating a regulated activity."

Turning to the second *Bolt* factor, plaintiffs claimed that the Village's concession that a portion the revenue generated from the increase in water and sewer rates would "be used to pay

for future capital improvements" amounted to "per se proof of a disproportionate rate scheme." They maintained that the increased rates "cannot be said to be proportionate to the current necessary costs because, by definition, they serve to afford the cost of future servicing." Plaintiffs additionally argued that the tiered rate structure was disproportionate because the high-volume users did not receive a greater benefit, despite being charged a higher rate.

Regarding the third *Bolt* factor, plaintiffs argued that the Village's contention that users can control how much water they use and its recommendations on how plaintiffs could reduce water consumption "contrast with the spirit of *Bolt*, and the assertion within that forcing a utility user to sacrifice the full potential of a property to avoid unreasonable fees is a de facto deprivation of property rights." They argued that "where every resident . . . bears the right to reap the maximum possible benefit of their property, water and sewer usage is compulsory."

In their request for relief, plaintiffs asked the court to deny the Village's motion for summary disposition, grant summary disposition to plaintiffs under MCR 2.116(I)(2), and declare that the Village's increased water and sewer rates represented a tax on users in violation of § 31 of the Headlee Amendment.

At a hearing on the parties' competing motions, the trial court noted that caselaw supported that some costs for capital improvements were allowed to be included in user fees without the fees "being a tax." It said, however, that a "very important question in this case" was whether that caselaw would allow "recouping money through user fees to build newly constructed infrastructure beyond just repair and replacing the existing" systems.

After this hearing, the court ordered supplemental briefing to address the following questions: "(1) what portion of the rate increase is allocated to finance the construction of an additional water tower; (2) what portion of the costs of construction of the additional water tower are financed by the rate increase; [and] (3) when the costs of construction of the additional water tower are fully paid, for what purposes will that portion of the rate increase that had been allocated to finance those costs be thereafter allocated[.]"

With respect to the first question, the Village in a supplemental brief represented that the portion of the rate increase allocated to finance the construction of the additional water tower was "approximately 13.9% annually for the first five years the new rate is in effect and none of the rate increase will be specifically allocated to the additional water tower thereafter." It estimated that the rate increase would generate additional water revenue of over $363,000 per year and additional sewer revenue of over $97,000 per year. Beginning with fiscal year 2018, the Village put over $50,000 of those revenues toward the cost of the additional water tower. The Village said that after five years of such reserves, no portion of the rate increase would be allocated toward the additional water tower.

As to the court's second question, the Village estimated that it would pay 14.3 percent of the anticipated cost of the new water tower with increased revenue from the new rate structure. According to the Village, the DEQ was requiring it to create additional storage capacity of 150,000 gallons, as long as additional power generators were installed at municipal wells. The cost of this project was $1.4 million. The Village said that it recently secured a community block grant of $1,350,000, of which $1,160,000 was allocated to the new water tower, but the grant required a

$450,000 contribution from the Village. The Village intended that $200,000 of its contribution would come from water revenue generated by the increased rate.

In answer to the court's third question, the Village said that the revenues generated by the increased rate would be used for a reserve fund for other capital-improvement needs once the additional water tower was completed. With respect to water revenue, the Village anticipated that revenue would be used to pay the Village's loan obligations for 40 years at the approximate rate of $220,000 per year. It said that revenue would also be used for various projects and expenses not addressed with loan proceeds. The Village provided a detailed description of the projects.

## B. THE TRIAL COURT'S OPINION

The court issued a 12-page opinion and order in which it denied the Village's motion for summary disposition and granted summary disposition in favor of plaintiffs. The court said that the question before it was limited to determining whether the increased water and sewer rates were a user fee or a tax, which necessitated an analysis of the *Bolt* criteria.

For the first *Bolt* factor, the court observed that it was undisputed that one of the reasons for the rate increase was the need to construct an additional water tower to increase the water storage capacity of the system. The court, citing *Shaw v Dearborn*, 329 Mich App 640, 643; 944 NW2d 153 (2019), reasoned that "[a] unit of local government may not fund a public works project through increased user fees under the Headlee Amendment." With this understanding of the law, the court believed that the Village's increase to its water and sewer rates had "a flaw embedded in it, in that it was intended for and used for the funding of construction of new infrastructure . . . , that being an additional, second water tower." In short, because some of the revenue generated from the increased water and sewer rates was intended to fund the construction of an additional water tower, the court concluded that the increase to the water and sewer rates had a primarily revenue-raising purpose, so the first *Bolt* factor favored plaintiffs.

Addressing the second *Bolt* factor, the court thought it "yield[ed] mixed results." On the one hand, the court agreed with plaintiffs that "[t]he tiered rate structure may well be problematic in that the high-volume users do not receive a greater benefit proportionate to their greater rate." On the other hand, the court agreed with the Village that the high-volume users drive the need for the additional water. But the court found two faults with the Village's argument: (1) the court believed that "charging a user fee to fund the construction of that water tower [was] itself impermissible" and (2) the Village did not explain "how the high-volume users drive the necessary costs of the water and sewer system in a way that would make the tiered rate structure proportionate as to those users." Still, the court credited the Village's argument that, even after the increases, its rates were reasonable compared to other similar utility systems in Michigan. Ultimately, while this factor "yield[ed] mixed results," the court concluded that it favored finding that the increased rates were a tax.

For the third *Bolt* factor, the court found that, based on caselaw, water and sewer rates are generally voluntary because each user decides the amount and frequency of the usage, and variable rates based on usage generally satisfy the voluntariness factor. This caselaw, the court explained, did not support plaintiffs' argument that the fees were involuntary because high-volume users would have to alter their use of their properties to avoid paying the stepped-up fees. The court

-10-

accordingly concluded that the third *Bolt* factor favored a finding that the rate structure was a user fee and not a disguised tax.

Overall, the court found that the first and second *Bolt* factors weighed heavily because the Village

> is funding new construction by charging ratepayers rather than taxpayers. The increased rate will continue long after the new construction is completed, and the stepped-up rate that high-volume users are charged will continue long after the justification for that tiered structure (the need for the second water tower) has passed. However, one of the major reasons for adopting the increased rate was to fund the construction of an additional water tower. This violates *Shaw*'s admonition that a fee may not be used to raise revenue to finance a public works project.

While the court believed that "this is not a clear-cut case one way or the other," it concluded that the Village's rate increase constituted a tax because a portion of the revenue generated by the increased water and sewer rates was intended "to fund *new infrastructure*." This, the court reasoned, was "impermissible under *Shaw* and a violation of the Headlee Amendment's taxpayer protections." The court accordingly held that the Village violated the Headlee Amendment by increasing its water and sewer rates.

## II. STANDARD OF REVIEW

The principal issue on appeal is whether the increase to the Village's water and sewer rates as part of its January 4, 2018 resolution constitutes a valid user fee or a tax. This presents a question of law, reviewed de novo. See *Bolt*, 459 Mich at 158.

## III. ANALYSIS

The Village argues that the trial court misread *Shaw*. This Court in *Shaw*, according to the Village, simply did not reach the issue of whether "new infrastructure" could be funded through user fees. And with the misunderstanding of *Shaw* out of the way, the Village continues, plaintiff cannot establish that the increase to the Village's water and sewer rates constituted a tax in violation of the Headlee Amendment. The Village is correct.

## A. HEADLEE VIOLATIONS GENERALLY

Const 1963, art 9, § 31 of the Headlee Amendment states in relevant part:

> Units of Local Government are hereby prohibited from levying any tax not authorized by law or charter when this section is ratified or from increasing the rate of an existing tax above that rate authorized by law or charter when this section is ratified, without the approval of a majority of the qualified electors of that unit of Local Government voting thereon.

Application of § 31 is triggered by the levying of a tax. *Jackson Co v City of Jackson*, 302 Mich App 90, 98; 836 NW2d 903 (2013), citing *Bolt*, 459 Mich at 158-159. "Section 31 prohibits units of local government from levying any new tax or increasing any existing tax above authorized rates without the approval of the unit's electorate." *Durant v Michigan*, 456 Mich 175, 182-183; 566 NW2d 272 (1997). But § 31 does not prohibit a local unit of government from instituting a user fee without voter approval. *Wheeler v Shelby Charter Twp*, 265 Mich App 657, 664; 697 NW2d 180 (2005). See also *Bolt*, 459 Mich at 159. The central question in this case is whether the charge that resulted from the increased water and sewer rates constituted a valid user fee or a tax. Plaintiffs bear the burden of proving that the charge constituted a tax in violation of the Headlee Amendment. *Shaw*, 329 Mich App at 653.

"There is no bright-line test for distinguishing between a valid user fee and a tax that violates the Headlee Amendment." *Bolt*, 459 Mich at 160. At the most basic, "a fee is exchanged for a service rendered or a benefit conferred, and some reasonable relationship exists between the amount of the fee and the value of the service or benefit," whereas "[a] tax . . . is designed to raise revenue." *Id*. at 161. The seminal case addressing this distinction is *Bolt*, in which our Supreme Court identified "three primary criteria" for courts to consider when distinguishing a user fee from a tax: (1) a user fee primarily serves a regulatory purpose, (2) a user fee is proportionate to the necessary cost of the service, and (3) a user fee is voluntary. *Id*. at 161-162. "These criteria are not to be considered in isolation, but rather in their totality, such that a weakness in one area would not necessarily mandate a finding that the charge is not a fee." *Shaw*, 329 Mich App at 653 (quotation marks and citation omitted).

## B. *SHAW*

In *Shaw*, the city of Dearborn had operated a combined sewer system whereby the raw sewage from homes and businesses entered the same pipes as stormwater. *Shaw*, 329 Mich App at 644. The combined sewage was sent to the Detroit Water and Sewerage Department for treatment before it could be released back into the environment. *Id*. Sometimes, a heavy rainstorm resulted in a combined-sewage-overflow event, releasing the combined sewage into a natural waterway before treatment. *Id*. As federal and state environmental regulations became more "stringent," the city was required "to plan and implement measures to reduce combined-sewage-overflow events." *Id*. The city's initial plan—funded by a millage with voter approval—was to construct 12 retention facilities, called caissons, that could store combined sewage. *Id*. at 644-645. Difficulties arose during the construction of the planned caissons, however, and only four caissons were in operation, serving a fraction of the city. *Id*. at 645. In some areas not served by the caissons, the city was undertaking a different abatement plan—it was separating the sewer system by providing separate pipes for sewage and stormwater. *Id*. Some of the areas had already been separated, while in the areas not yet separated, "the city is either installing a new pipe for stormwater and using the existing one for sewage or vice versa." *Id*. at 645-646. Coincident with the construction project required to separate the sewer system, the city chose to repair and replace some existing underground infrastructure, such as replacing old or deteriorated water and sewer lines. *Id*. at 646. The city scheduled this ancillary work at the same time as the sewer separation project to save money. *Id*. Some of the cost of this ancillary work was paid with revenue generated from the water and sewer rates the city charged its water and sewer customers. *Id*.

The plaintiff brought suit, arguing that hidden charges in the city's water and sewer rates were being used to fund these various projects, and that these charges amounted to taxes instituted without voter approval in violation of the Headlee Amendment. As relevant to the instant case, the plaintiff in *Shaw* argued that the city was using revenue generated by its water and sewer rates to fund some of the infrastructure costs of the city's sewer-separation project (what the plaintiff called the "CSO-capital charge"). *Id*. at 648. The trial court rejected the plaintiff's challenge, and the plaintiff appealed. *Id*. at 650-651.

This Court affirmed. This Court, accepting plaintiff's terminology, defined the CSO-capital charge as "the imposition on water and sewer ratepayers of some of the infrastructure costs of the city's sewer-separation project." *Id*. at 656. Rejecting the plaintiff's claim related to the CSO-capital charge, this Court reasoned that the plaintiff had failed to carry her burden of proving that the city used revenue generated by its water and sewer rates to pay for the city's sewer-separation project. The plaintiff, we explained, "simply has not presented evidence establishing that any funds obtained from water and sewer rates were used to pay for the mandatory sewer-separation project itself." *Id*. at 663. See also *id*. at 657 ("[A]fter ample time and significant discovery, plaintiff has presented no evidence that the city actually charged the costs of the sewer-separation work to its ratepayers . . . .").

C. "NEW INFRASTRUCTURE"

Relying on *Shaw*, the trial court in the present case held that user fees cannot be used to raise revenue to finance "new infrastructure."[10] As recounted above, *Shaw* held no such thing.

Concluding differently, the trial court reasoned:

[I]n other areas of Dearborn, the city constructed retention facilities, called caissons, to store the combined sewage to avoid overflow events during heavy storms. *Id*. at 645. The manner of financing this project is noteworthy here. The panel in *Shaw* described it as follows: "Although the city funded the construction of the caissons through the millage, it currently pays the cost of operating and maintaining the caissons with revenue generated by sewer rates charged to the city's sewer customers. *In other words, taxpayers* built *the four caissons, ratepayers* operate and maintain *them. Id*. at 645 (emphasis added). This suggests that the initial construction of the new infrastructure, *even when performed in response to regulatory requirements*, could not be funded through increased rates to taxpayers. Rather, the funding of such new constructions involves taxes. In Dearborn's case, they submitted a millage proposal to the voters to approve the city to incur debt and use the increased millage rate to service the debt. *Id*. at 644-645.

---

[10] The trial court used the term "new infrastructure" synonymously with "new construction," "public works project," and "capital improvements." Plaintiffs do the same on appeal, saying for instance, "That deficiency could only be addressed by adding to the existing infrastructure i.e., making capital improvements. Capital improvements create new elements of infrastructure, they are not operational costs for existing infrastructure."

-13-

Such an option was available and open to defendant in this case. Instead, defendant is funding new construction through increased rates.

The portions of *Shaw* relied on by the trial court were in the opinion's statement of facts. See *Shaw*, 329 Mich App at 643-647. While *Shaw*'s facts are obviously relevant to understanding that case, there is no basis to think that *Shaw* was declaring a rule of law by recounting the facts of the case before it. That "taxpayers built the four caissons [and] ratepayers operate and maintain them," *id*. at 645, was a fact. It did not "suggest" anything. And, as previously explained, *Shaw* did not reach the issue of whether the water and sewer rates at issue could be used to fund "new infrastructure." Rather, this Court concluded that the plaintiff did not present evidence establishing that the city used funds obtained from water and sewer rates to pay for the sewer-separation project. *Id*. at 663. In short, the trial court misread *Shaw* to conclude "that it is impermissible under *Shaw* to fund *new infrastructure*." *Shaw* simply did not address that issue.

Still, *Shaw* did say, "The purpose of the amendment would be thwarted if a local authority could charge higher utility rates to raise revenue and then use some of the excess funds to finance a public-works project." *Shaw*, 329 Mich App at 643. Rather than parsing this statement (made in *Shaw*'s introductory paragraph) to decipher precisely what *Shaw* meant, it is enough to observe that the statement can be true. For instance, if the plaintiff in *Shaw* had been able to establish that the city was using funds obtained from water and sewer rates to pay for the sewer-separation project, she may well have been able to establish a Headlee violation—a sewer-separation project like the one in *Shaw* tends to benefit the general public instead of only those paying water and sewer rates. Accord *Bolt*, 459 Mich at 166; *Jackson Co*, 302 Mich App at 108-109. But this statement from *Shaw* should not be read as standing for the proposition that a user fee can never be used to fund "new infrastructure" or "capital improvements."

Doing so would contradict caselaw decided both before and after *Shaw*. *Bolt* itself states, "Where the charge for either storm or sanitary sewers reflects the actual costs of use, metered with relative precision in accordance with available technology, *including some capital investment component*, sewerage may properly be viewed as a utility service for which usage-based charges are permissible, and not as a disguised tax." *Bolt*, 459 Mich at 164-165 (emphasis added, citation omitted).[11] Shortly after *Bolt* was decided, this Court in *Graham v Kochville Twp*, 236 Mich App 141, 152; 599 NW2d 793 (1999), held that a charge constituted a valid user fee even though the

_____

[11] *Bolt* also said that the charge at issue in that case "constitute[d] an investment in infrastructure as opposed to a fee designed simply to defray the costs of a regulatory activity," *Bolt*, 459 Mich at 163, but this statement does not support the trial court's rule. First, *Bolt* itself recognized that a valid user fee could include a capital-investment component, as noted above. *Id*. at 165. Second, the charge in *Bolt* had a substantial capital-investment component—the city intended to fund 50 percent of a $176 million project through the disputed charge, and 63 percent of that cost "constitute[d] capital expenditures." *Id*. at 163. Lastly, and most importantly, the charge in *Bolt* was a tax not solely because some portion of it constituted an investment in infrastructure but because, among other things, the charge (1) had a revenue-raising purpose, (2) was not proportionate to the cost of the service provided, and (3) was involuntary. *Id*. at 163-169.

-14-

charge would "pay for an investment in infrastructure." This Court explained that this did not render the charge a special assessment[12] because (1) the infrastructure that the charge was used to build would "not benefit the general public" and (2) the purpose of the charge was mainly regulatory. *Id*. at 152-153. More recently, this Court in *Youmans v Charter Twp of Bloomfield*, 336 Mich App 161, 229; 969 NW2d 570 (2021), held that an increase to water and sewer rates intended to, among other things, increase revenue to fund "necessary capital improvements" served a primarily regulatory purpose and did not violate the Headlee Amendment. See *id*. at 233. The statement from *Bolt* and the holdings in *Graham* and *Youmans* all support that revenue generated by a user fee can be used to fund new infrastructure or capital improvements. That said, the ultimate determination of whether any charge is a valid user fee or a tax does not turn on whether the charge will be used to fund "new infrastructure." Rather, courts apply the "three primary criteria" to distinguish between a fee and a tax identified in *Bolt*, 459 Mich at 161-162.

## D. APPLYING THE *BOLT* CRITERIA

### 1. FIRST *BOLT* CRITERION

The first criterion identified in *Bolt* looks to a charge's purpose. Courts are to consider whether the charge primarily serves a regulatory or a revenue-raising purpose. *Id*. at 161. If the charge primarily serves a regulatory purpose, it tends to support that the charge is a user fee. If the charge primarily serves a revenue-raising purpose, it tends to support that the charge is a tax.

Generally speaking, "it is beyond dispute" that water and sewer rates serve the regulatory purpose of providing water and sewer services to ratepayers. *Shaw*, 329 Mich App at 666. Such rates "fund the operational and capital expenses" of the water and sewer systems, which likewise "serves the primary function of providing water and sewer services" to ratepayers. *Youmans*, 336 Mich App at 228.

It is undoubtedly true, as plaintiffs contend, that the increase to the Village's water rates was intended in part to raise revenue to partially fund the construction of a new water tower. But a fee can "raise money as long as it is in support of the underlying regulatory purpose." *Graham*, 236 Mich App at 151, citing *Merrilli v St Clair Shores*, 355 Mich 575, 583; 96 NW2d 144 (1959). Raising money for the construction of the second water tower plainly served the underlying regulatory purpose of providing water services to ratepayers. The Village's water-supply system was out of compliance with Act 399, as demonstrated by the correspondences from the DEQ to the Village. To bring its water-supply system into compliance with Act 399 and ensure that it could continue delivering potable water to ratepayers, the Village needed to increase its water storage capacity. It sought to accomplish this by constructing an additional water tower. The construction of the additional water tower was thus done in an effort to comply with the Village's obligations under Act 399 and the DEQ's regulation of that act. Raising money to partially fund this construction, in turn, served the underlying regulatory purpose of providing water services to

---

[12] The issue in *Graham* was not whether the charge was a user fee or a tax but whether it was a user fee or a special assessment. See *Graham*, 236 Mich App at 150-151.

ratepayers. "Categorically, obligations arising out of administrative-agency regulations serve a regulatory purpose." *Youmans*, 336 Mich App at 228-229.[13]

The amount of revenue from the increased rates going to fund the second tower, moreover, represented a mere fraction of the revenue generated by the increased water and sewer rates. According to the Village, only 13.9 percent of the revenue generated by the increased water rates would go towards the second water tower for the first five years, and then none of the rate increase would be allocated to the water tower thereafter.[14] The remainder of the revenue generated was intended to be used for various projects, fund capital and operational reserves, and pay for maintenance and operational expenses related to the systems. Plaintiffs do not appear to dispute that the use of the rate revenue in this way served a regulatory purpose. Even if they did, the argument would be meritless. This Court has repeatedly held that using funds generated by water and sewer rates to pay for the operation and maintenance of the water and sewer systems, including using the funds to increase capital and operational reserves, serves a regulatory purpose. *Shaw*, 329 Mich App at 666; *Youmans*, 336 Mich App at 229. On this record, the Village's act of increasing water and sewer rates to, among other things, pay for necessary capital improvements to those systems (including the construction of a second water tower), primarily served a regulatory purpose.

Plaintiffs insist that the rate increases must serve a revenue-raising purpose because high-volume users in the tiered (or ascending) rate structure do not receive a greater corresponding benefit. High-volume users, plaintiffs say, will generate most of the new revenue under the increased water and sewer rates but "will not realize any greater benefit from the infrastructure improvements than any other member of the general public." This argument is unpersuasive. As the Villages rightly observes, high-volume users burden the system more, contributing to its wear and tear and driving the need to invest in capital. It is not serving a revenue-raising purpose to ask users of a system to pay for capital infrastructure that will directly benefit those users. That the high-volume users will bear a greater portion of this cost reflects the fact that such users use the system more.[15] Those users will, contrary to plaintiffs' suggestion, certainly realize a greater benefit from infrastructure improvements to the Village's water and sewer systems compared to the general public. Not all members of the general public use the Village's water and sewer

---

[13] The Village on appeal repeatedly asserts that the DEQ ordered the Village to construct the additional water tower, while plaintiffs and the DEQ in an amicus brief dispute this characterization. Regardless of whether the Village was ordered or simply encouraged to construct the second water tower, the fact remains that the Village needed to construct the second water tower to bring its water-supply system into compliance with Act 399.

[14] There is no suggestion that the Village planned to use revenue generated by the increased sewer rates to pay for the water tower. The construction of the second water tower, according to the Village, was to be funded with revenue generated by the increased water rates.

[15] Relatedly, it bears remembering that every user of the Village's water and sewer systems is subject to the same rates—everyone pays one rate up to 50,000 gallons per quarter, and then a stepped-up rate for every gallon over 50,000. That high-volume users pay the increased rates reflects that they choose to use more water, which relates to the third *Bolt* factor—voluntariness.

systems, whereas the high-volume users, as users of those systems, benefit from the systems directly. For these reasons, application of the first *Bolt* factor clearly favors concluding that the Village's increased water and sewer rates constituted a valid user fee because the rates were increased primarily to serve a regulatory purpose.

## 2. SECOND *BOLT* CRITERION

The second criterion identified in *Bolt* looks to the proportionality of the charge; it asks courts to consider whether the charge is proportionate to the necessary cost of the service provided. *Bolt*, 459 Mich at 161-162. If so, it supports that the charge is more likely a user fee.

Municipal utility rates, such as water and sewer rates, are presumed reasonable. *City of Novi v City of Detroit*, 433 Mich 414, 428; 446 NW2d 118 (1989). This presumption can be "overcome by a proper showing of evidence." *Trahey v City of Inkster*, 311 Mich App 582, 594; 876 NW2d 582 (2015). The reasonableness of municipal utility rates is relevant when considering the second *Bolt* criterion. *Youmans*, 336 Mich App at 227. This is because a reasonable rate is more likely to be proportionate to the cost of providing the service. See *Jackson Co*, 302 Mich App at 109. The proportionality of a charge is not a question of mathematic precision. *Shaw*, 329 Mich App at 667. When a charge reflects actual use, "metered with relative precision," it "may properly be viewed as a utility service for which usage-based charges are permissible." *Bolt*, 459 Mich at 164-165. See also *Shaw*, 329 Mich App at 667.

Plaintiffs bore the burden of establishing that the Village's water and sewer rates were not proportionate to the necessary cost of providing those services, which included overcoming the presumption that the Village's utility rates were reasonable. Attempting to carry their burden, plaintiffs observe that the Village's water and sewer rates were intended to partially fund the construction of the second water tower.[16] From this, plaintiffs conclude that "the costs of the new rates cannot be said to be proportionate to the current necessary costs of service because, by definition, they serve to afford the cost of future servicing."

Besides being factually wrong,[17] plaintiffs' argument attempts to make a distinction between "current" and "future" costs when it is not apparent that such a distinction is relevant. It would be absurd to conclude that the Village could never plan for "future servicing" without rendering its rates disproportionate. Planning for the future health of water and sewer systems is plainly part of providing those services. Caselaw supports this conclusion. For instance, in *Youmans*, the rates were increased in part to fund (1) additional capital and operational reserves and (2) necessary capital improvements, and this Court held that the rates were proportionate. *Youmans*, 336 Mich App at 229-230. More generally, plaintiffs' argument is unconvincing

---

[16] Both plaintiffs and the trial court focused on this fact when considering the second *Bolt* factor. As explained in Part III.C of this opinion, however, there is no bright-line rule that that a user fee can never be used to fund "new infrastructure" or "capital improvements."

[17] The Village's water-supply system needed additional water storage capacity to bring it into compliance with Act 399, so constructing an additional water tower was part of "the current necessary cost" of providing water to ratepayers.

-17-

because they do not point to a shred of evidence suggesting that the Village's rates were unreasonable or disproportionate, regardless of whether the rates were funding "current" or "future servicing."

The trial court, for its part, found the Village's tiered rate structure problematic when considering the proportionality of the increased rates. The court faulted the Village for "not explain[ing] how the high-volume users drive the necessary costs of the water and sewer system in a way that would make the tiered rate structure proportionate to those users." But this reasoning flips the burden on its head. The Village did not need to establish that its rate structures were proportionate; plaintiff bore the burden of establishing both that the Village's rates were unreasonable and disproportionate. While the trial court may have questioned the wisdom of the Village's tiered rate structure, it was not the court's "role to determine whether a municipal government has chosen the best, wisest, most efficient, or most fair system for funding a municipal improvement or service." *Shaw*, 329 Mich App at 668. The mere fact that the Village used a tiered rate structure is not per se evidence that the rate is disproportionate. Plaintiffs must offer evidence to support their position, and they failed to do so. *Id*.

Even putting all of this aside, the only evidence in the record related to the reasonableness of the Village's rates supports that the rates were reasonable. The Village presented a comprehensive rate study, a review of the rates by a ratemaking expert (Beauchamp), and a comparison of water rates from other northern Michigan municipalities. Beauchamp testified that the Village's tiered rate structure was justified based on the Village's "very unusual pattern" of water usage, where the summer peak usage was 2.8 times the average usage. Beauchamp also opined that the break-point of 50,000 gallons and the stepped-up rate of a 50-percent increase were reasonable. And the Village's community comparison charts, which were not disputed, showed that the Village's rate structure was in the average among similarly situated communities—the Village's ratepayers of all meter sizes "would have paid more in total charges in at least one third of the other communities." Plaintiffs presented no evidence to dispute any of this or to rebut the presumption that the Village's water and sewer fees were reasonable and proportionate to the costs of service.

As one final point, it is uncontested that the Village determines its water and sewer rates based on metered-water usage. Plaintiffs have not argued, nor does any evidence in the record suggest, that plaintiffs' water usage is not accurately metered. This distinguishes this case from *Bolt* and *Jackson*. In those cases, the local units of government charged a stormwater fee to residential parcels of two acres or less a flat rate rather than a rate based on the parcel's individual characteristics. See *Bolt*, 459 Mich at 156; *Jackson Co*, 302 Mich App at 110. This case is more akin to *Shaw*. There, this Court reasoned that the city's water and sewer rates were proportionate to the necessary cost of the services in part because it was uncontested that the city "determine[d] its water and sewer rates based on metered-water usage," and nothing in the record suggested that the metered-water usage was "an insufficiently precise measurement of the actual costs of using the city's water and sewer systems . . . ." *Shaw*, 329 Mich App at 667.

For all of these reasons, the Village is correct that application of the second *Bolt* criterion "decisively" weighs in favor of concluding that the disputed portion of the rates was a user fee rather than a tax. The only evidence in the record supports that the Village's water and sewer rates are proportionate to the necessary cost of providing the services.

-18-

## 3. THIRD *BOLT* CRITERION

The third criterion identified in *Bolt* considers the voluntariness of a charge. If the charge is compulsory, then it is more likely a tax. *Bolt*, 459 Mich at 167. If the charge is only compulsory for those who use the service, and if the user can choose how much of the service to use, then the charge is more likely a user fee. *Id.*

Our Supreme Court has repeatedly explained:

> The water rates paid by consumers are in no sense taxes, but are nothing more than the price paid for water as a commodity, just as similar rates are payable to gas companies, or to private water works, for their supply of gas or water. No one can be compelled to take water unless he chooses, and the lien, although enforced in the same way as a lien for taxes, is really a lien for an indebtedness, like that enforced on mechanics' contracts, or against ships and vessels. The price of water is left to be fixed by the board in their discretion, and the citizens may take it or not as the price does or does not suit them. [*Bolt*, 459 Mich at 162, quoting *Ripperger v City of Grand Rapids*, 338 Mich 682, 686; 62 NW2d 585 (1954), quoting *Jones v Detroit Water Com'rs*, 34 Mich 273, 275 (1876) (quotation marks omitted).]

Here, like in *Shaw*, 329 Mich App at 669, "[e]ach individual user decides the amount and frequency of usage, i.e., each user decides how much water to draw from the tap." This in turn supports that the charges at issue are voluntary because each user of the Village's water and sewer system can control how much water they use. See *id.*

Plaintiffs resist this conclusion. They argue that concluding that water and sewer rates are voluntary goes against "the spirit of *Bolt*" and would "forc[e] a utility user to sacrifice the full potential of a property to avoid unreasonable fees,"[18] amounting to a "de facto deprivation of property rights." This argument misses the mark. Water and sewer rates are voluntary *because* users like plaintiffs have the option of limiting how much they use the services. They retain full control of their property rights, including how much water they use. The only caveat is that they have to pay for that usage. But just because a charge is voluntary does not necessarily mean it is a user fee. See *Bolt*, 459 Mich at 162 n 12 (explaining that *Ripperger* does not "stand[] for the proposition that sewage charges are always user fees" but "articulated relevant criteria for determining whether a charge is a fee or a tax"). The *Bolt* criteria are to be considered in their totality, and a finding that a charge is voluntary does not necessitate finding that the charge is a fee. See *Shaw*, 329 Mich App at 653. The problem for plaintiffs is that, after applying the *Bolt* criteria, nothing suggests that the Village's increased water and sewer rates constituted a tax.

## IV. CONCLUSION

The Village was informed by the DEQ that its water-supply system was in violation of Act 399 due to insufficient water storage capacity, and that the Village's current rate structure was

---

[18] As explained above, plaintiffs have not presented any evidence in support of their assertion that the water and sewer rates are unreasonable.

inadequate to support its water and sewer systems. The DEQ explained that the inadequate funding could affect the reliability of the systems if the Village was unable to pay for expenses needed to "sustainably operate the system," which included operational, maintenance, and replacement expenses, as well as "new infrastructure when needed." To remedy these deficiencies, the Village increased its water and sewer rates.

The increased rates primarily served the regulatory purpose of providing reliable and sustainable water and sewer services to ratepayers. True, the water-rate increase was intended to partially fund the construction of an additional water tower. But the construction of that water tower served the underlying regulatory purpose of providing water services—the additional water storage capacity was needed to bring the Village's water-supply system into compliance with Act 399. Ensuring that water delivered to ratepayers is and remains potable serves a regulatory purpose. The construction of the second water tower was a necessary cost to continue delivering this service, so raising money to partially fund that construction served the underlying regulatory purpose. The increased water and sewer rates were also necessary to fund various projects and increase operational and capital reserves, as well as pay for maintenance and operational expenses related to the water and sewer systems. All of this served the regulatory purpose of providing water and sewer services to ratepayers.

Nothing in the record suggests that the increased water and sewer rates were disproportionate to the cost of providing the services, nor is there any evidence in the record rebutting the presumption that the Village's increased water and sewer rates were reasonable. In fact, all of the record evidence supports finding that the Village's increased water and sewer rates were reasonable and proportionate. While the Village uses a tiered rate structure for its water and sewer rates, that was a policy choice to ensure that users who burden the system more bear the brunt of the cost for maintaining the system. It does not per se render the rates disproportionate or unreasonable; plaintiffs must still present evidence to that effect, and there is no such evidence in the record. The Village, moreover, ensures that users only pay for what they actually use through metered-water usage. And finally, the Village's water and sewer rates are only compulsory for those who choose to use the services, and those users can choose how much of the service to use.

All of this, taken together, makes clear that the Village's increased water and sewer rates constituted a valid user fee, not a tax.[19] The trial court's order granting plaintiffs' motion for summary disposition is reversed, and the case is remanded for the trial court to enter an order granting summary disposition in favor of the Village.

Reversed and remanded. We do not retain jurisdiction.


/s/ Colleen A. O'Brien
/s/ Michael J. Kelly

---

[19] In light of this conclusion, it is unnecessary to address plaintiffs' cross-appeal that the trial court abused its discretion by denying monetary damages to plaintiffs.